**ORDERED.**

**Dated:  July 11, 2024**

Jason A. Burgess
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

KAREN W. HALL,                                              Case No. 3:22-bk-01326-BAJ
SPUDDOG FARM PROPERTIES LLC,              Case No. 3:22-bk-01341-BAJ
                                                                       Chapter 11

                            Debtors.
_____/

KAREN W. HALL,
SPUDDOG FARM PROPERTIES LLC,

                            Plaintiffs,
v.                                                                    Adv. No. 3:22-ap-00086-BAJ

WBL SPO II, LLC,
WORLD BUSINESS LENDERS, LLC,

                            Defendants.
_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

        This Proceeding came before the Court for a two-day trial beginning on January 24,

2024, on the Complaint brought by Karen W. Hall ("Mrs. Hall") and Spuddog Farm Properties

LLC ("Spuddog") (collectively the "Plaintiffs") against WBL SPO II, LLC, and World

Business Lenders, LLC (collectively "WBL").  The Plaintiffs seek to invalidate the claim of

WBL    based    upon    allegations    of    Fraudulent    Inducement    (Count    I),    Intentional

Misrepresentation (Count II), Negligent Misrepresentation (Count III), Recharacterization as Equity (Count IV), Equitable Subordination (Count VI), and Objection to Claim (Count VIII).[1]

### Findings of Fact

Karen Hall and her husband, Benny F. Hall, lived in Virginia their entire lives before moving to Florida in 2019.[2] In 1992, they operated a family farm in Temperanceville, Virginia, consisting of two chicken houses. In addition to raising chickens, the Halls farmed corn, wheat, soybeans, string beans, and potatoes.[3] Mr. Hall oversaw the farming operations, working in the fields from early in the morning until late in the evening. While Mr. Hall handled the family business, Mrs. Hall worked at Metompkin Bank & Trust ("Metompkin Bank") in an administrative role from 1974-1999.[4] After leaving her job at Metompkin Bank, Mrs. Hall supported the family farming operations by performing administrative tasks such as answering the phone and coordinating payroll.

Over the years, the Halls' farming operations expanded to include numerous entities, which acted as real estate holding companies and operational businesses. In addition to farming multiple crops, the Halls' businesses included trucking services, grain storage, produce sales, and clamshell sales. The business entities included: Consolidated Farms, Benny F. Hall & Sons Trucking Co., Inc., Eastern Shore Grain, Inc., Farm Properties, L.L.C., Holden's Creek Farm, LLC, Spuddog Farm Properties LLC, and Benny F. Hall & Sons, LLC.[5]

---

[1] The Complaint includes eight counts; however, the Court will adjudicate Count V at a later trial, and the Parties agreed to voluntarily dismiss Count VII by filing a Stipulation to Voluntarily Dismiss Count VII with Prejudice. (Doc. 93).
[2] January 24, 2024, Trial Transcript, p. 29 (Doc. 118).
[3] Id. at p. 30.
[4] Id. at pp. 31, 203.
[5] For the sake of brevity, the Court may refer to Mr. Hall, Mrs. Hall, their affiliated companies, their agents and employees, or some combination thereof, as the "Halls."

By 2012, the Halls owned and managed a large farming operation and ancillary businesses. The most profitable entity was Consolidated Farms, a partnership Mr. Hall co-owned with his son, Benny F. Hall, Jr.[6] Because of unfortunate circumstances, the business and personal relationships between father and son soured.[7] The demise of the Halls' relationship with their son resulted in litigation that commenced in 2013. The litigation was costly to the Halls personally and financially.[8] In addition to substantial legal fees, the Halls lost their traditional sources of financing due to the pending litigation.[9] In 2014 and 2015, multiple banks that historically lent to the Halls ceased offering financing to the Halls.[10] By late 2015, the Halls desperately needed to obtain alternative financing to fund their extensive operations.

In 2012, subsequent to the departure of the Halls' son and daughter-in-law from the family business, the Halls employed Gary Stewart to be their de facto CFO.[11] Mr. Stewart was an old friend and colleague of Mrs. Hall from Metompkin Bank, where he served as CEO from 1971 to 1980. Following his tenure at Metompkin Bank, Mr. Stewart went to work for Byrd Foods, Inc. for thirty years, including ten years as CFO.[12] From 2012 to 2020, Mr. Stewart and Mrs. Hall worked together managing the financial side of the Halls' businesses, while Mr. Hall managed the operational aspects.

After losing their traditional financing sources, the Halls worked diligently with Mr. Stewart to obtain another source of conventional financing. Despite their best efforts, the Halls'

---

[6] January 24, 2024, Trial Transcript, p. 33 (Doc. 118).
[7] Id. at pp. 278-79; Defendant's Exhibit 17, pp. 159-60.
[8] January 24, 2024, Trial Transcript, p. 36 (Doc. 118).
[9] Id. at p. 39.
[10] Id. at pp. 38-39.
[11] Defendant's Exhibit 17, pp. 27-28; Defendant's Exhibit 18, p. 15.
[12] Defendant's Exhibit 18, pp. 10-11.

attempts to obtain conventional financing were fruitless.[13]  The lack of financing placed the Halls in immediate danger of having to cease operations.[14]  In early 2016, as a last resort, the Halls began obtaining high-interest loans from merchant cash advance ("MCA") lenders.  This resulted in the Halls accumulating approximately $500,000 in MCA loans that required burdensome daily payments.[15]  The Halls planned to satisfy the MCA loans with financing from BB&T.  The Halls' line of credit with BB&T had historically renewed annually, and BB&T assured the Halls that the renewal was forthcoming.  However, by March 2016 it became apparent that BB&T would not be renewing their line of credit.[16]  Due to the lack of financing, the Halls defaulted on the MCA loans, which resulted in MCA lenders taking aggressive collection actions against them.[17]

In February 2016, the Halls' attorney, John McIntryre, advised them to form Spuddog to hold property as collateral to obtain a business loan.[18]  Mr. McIntyre reasoned that Spuddog had a better chance of obtaining a business loan because of the Halls' poor personal credit history.[19]  On March 14, 2016, the Halls transferred certain properties from their personal names into the newly formed Spuddog.  The transferred properties included, but were not limited to, 8013 Long Lane, Temperanceville, VA 23442.[20]  The Halls assert that although they transferred

---

[13] Defendant's Exhibit 18, pp. 22-23.

[14] See, e.g., January 25, 2024, Trial Transcript, p. 22 (Doc. 119).

[15] Defendant's Exhibit 17, p. 56.

[16] January 24, 2024, Trial Transcript, p. 39 (Doc. 118) (Karen Hall stated "[t]hey kept telling us, you know, they – we're going to get it done, going to get it done" referring to BB&T promising to renew their line of credit.); Defendant's Exhibit 12 (Karen Hall e-mail stated: "As we got to the middle of March [2016], we realized that the [BB&T] line renewal was not going to happen in time, and that the bank accounts would not be sufficient to cover the ACH payments.").

[17] See Defendant's Exhibit 20.

[18] January 24, 2024, Trial Transcript, p. 291 (Doc. 118).

[19] Id. at pp. 67-68.

[20] The real properties were transferred to Spuddog *prior* to any communications between the Halls and WBL.

their "house" in Virginia to Spuddog it was never their intent for their "house" to be offered as collateral.[21]

While seeking financing to pay off the MCA loans, Mr. Stewart met Tesh Shere and subsequently introduced Mr. Shere to the Halls.  Although Mrs. Hall was "under the impression" that Mr. Shere worked for WBL, Mr. Shere was in fact a broker who worked for Kwik Capital.[22]  On March 17, 2016, Mr. Shere informed the Halls that he had two interested "investors," one being WBL.[23]  On March 21, 2016, WBL provided the Halls with a "Conditional Approval," which included verifications that the Halls and their business entities owned various parcels of unencumbered real property.[24]  The Conditional Approval provided for funding "[u]p to $2,000,000" with daily payments of $10,612.  Upon receiving the Conditional Approval, the Halls and Mr. Stewart were distraught that the terms did not align with Mr. Shere's prior oral assertions.[25]  In response to the Halls' concerns, Mr. Shere stated in an e-mail dated March 23, 2016: "I understand that you had sticker shock yesterday and I don't blame you I would have had it as well."[26]  Mr. Shere proceeded to assure the Halls that this would only be a bridge loan to conventional financing once the Halls could "get [] out of the hole, pay off [their] other lenders, clean up [their] credit situation, [and] clean up [their Confessions of Judgment]."[27]

---

[21] January 24, 2024, Trial Transcript, pp. 46-47 (Doc. 118).
[22] Mr. Shere's employment as a broker for Kwik Capital is reflected in his e-mail communications. Defendant's Exhibit 11, p. 2.
[23] Id.
[24] Plaintiffs' Exhibit 4, p. 2 ("Validation of value for properties located at GROTON, 8013 LONG LN, SAXIS RD 20305 GREENBUSH RD, BLACKSTONE CHASE, RUSSELL DUMP AND LANKFORD HWY OAK HALL VA 23416 with encumbrances no greater than $0.")
[25] Plaintiffs' Post-Trial Brief, p. 7 (Doc. 134).
[26] Plaintiffs' Exhibit 6, p. 2.
[27] Id.

On March 28, 2016, Mr. Shere and Michael John, a WBL representative, traveled to Virginia to meet with the Halls.[28]  During this time, the Halls openly expressed their concerns that the proposed loan terms were usurious and the payment schedule unsustainable.[29]  In response, Mr. Shere and Mr. John attempted to reassure the Halls that the loan would be a bridge loan to conventional financing.  During this conversation, Mr. John stated that he was a "magician" and that another WBL employee would "get right to work on" obtaining them conventional financing.[30]  Although Mr. John made colorful remarks to the Halls about his ability to get them financing, he also cautioned that WBL would need to see if the payments on the interim loan were timely made before offering conventional financing.[31]  Mr. Stewart and Mr. Hall then gave Mr. Shere and Mr. John a "tour" of the Halls' real estate that would potentially be used as collateral for future loans.[32]

The Halls ultimately proceeded with the loan process,[33] and WBL continued to perform due diligence and obtain documentation from them.[34]  On or about May 11, 2016, the Halls entered into the first loan transaction with WBL (the "First Transaction").[35]  The Halls' testimony and the documentary evidence reflect that the Halls "desperately" needed the loan[36] because the MCA lenders were actively obtaining judgments and garnishing their bank accounts.[37]

---

[28] Plaintiffs' Exhibit 7.
[29] January 24, 2024, Trial Transcript, p. 43 (Doc. 118).
[30] Id. at p. 45.
[31] January 25, 2024, Trial Transcript, p. 41 (Doc. 119).
[32] Id. at pp. 15-16.
[33] The Plaintiffs were also represented by their counsel, John McIntyre, "throughout the entire loan origination and funding process with WBL." January 24, 2024, Trial Transcript, p. 213 (Doc. 118); Plaintiffs' Exhibit 14.
[34] See, e.g., Plaintiffs' Exhibits 8-11.
[35] Plaintiffs' Exhibit 12.
[36] See, e.g., Plaintiffs' Exhibit 13, p. 2.
[37] January 24, 2024, Trial Transcript, p. 222 (Doc. 118).

The First Transaction was a loan of $350,000 that carried an exorbitant interest rate and required the Halls to repay $605,500.10 within twelve (12) months.[38] The security for the First Transaction consisted of liens on the Halls' real and personal property, including real property conveyed to Spuddog before the First Transaction.[39]

Although the First Transaction was insufficient to fund the Halls' operations, Mrs. Hall testified that the Halls "would have been in a little worse shape if we hadn't gotten [the first loan]."[40] Similarly, WBL's corporate representative testified that in his opinion the WBL payments were less onerous than the MCA payments because the MCA loans were amortized over a shorter period.[41]

On or about June 24, 2016, the parties entered into a second loan (the "Second Transaction"),[42] which also contained onerous terms, including a $935,795 loan with a total repayment of $1,618,908.83 due within twelve (12) months. Because the Second Transaction refinanced the First Transaction, the Second Transaction only allowed for a cash disbursement of $362,370.86.[43] In connection with the Second Transaction, the Halls' attorney, John D. McIntyre, furnished an opinion letter to WBL on behalf of the Halls.[44] Among other things, the letter identified the collateral for the Second Transaction as 20305 Greenbush Rd, Parksley, VA 23421 and 8013 Long Lane, Temperanceville, VA 23442.[45] On June 27, 2016, WBL issued

---

[38] At the trial, Plaintiffs' counsel stated in his opening remarks that the interest rate would be criminally usurious in Florida but was "apparently allowable under Virginia law." Id. at p. 15.
[39] Plaintiffs' Post-Trial Brief, pp. 8-9 (Doc. 134).
[40] January 24, 2024, Trial Transcript, p. 223 (Doc. 118).
[41] January 25, 2024, Trial Transcript, p. 148 (Doc. 119).
[42] Plaintiffs' Exhibit 15.
[43] Id. at p. 2.
[44] Defendant's Exhibit 6.
[45] Id. at p. 2.

the Halls another loan for $120,000, which was primarily used to satisfy a loan from an MCA lender (the "Third Transaction").[46]

In January 2017, Mrs. Hall cancelled the closing on a loan with WBL based upon a conversation between a WBL employee and one of the Halls' employees.[47] Internal WBL e-mail correspondence indicated that an employee "from Newington branch told him that he would get him a conventional loan, and pay WBL off and that it's best if he doesn't proceed with the funding."[48] The Halls opine that this correspondence supports their position that WBL never intended to offer them conventional financing. It is WBL's position that the WBL employee, who subsequently resigned, was unfamiliar with the Halls' file and was speaking outside the scope of his authority.[49]

According to Mrs. Hall, another WBL representative persuaded her to proceed with the loan based on assurances that WBL would continue to work on providing the Halls with conventional financing. On January 12, 2017, the parties closed on a fourth transaction (the "Fourth Transaction").[50] Tellingly, in an e-mail dated January 13, 2017, Mrs. Hall stated that they needed the funds from the Fourth Transaction "today to meet our payroll."[51]

Like the prior WBL loans, the Fourth Transaction contained onerous terms. In connection with the Fourth Transaction, Mr. Hall, Mrs. Hall, and Spuddog executed a Deed of

---

[46] Plaintiffs' Exhibit 16; January 24, 2024, Trial Transcript, p. 102 (Doc. 118).
[47] January 24, 2024, Trial Transcript, pp. 158-59 (Doc. 118).
[48] Plaintiffs' Exhibit 20, p. 2. In the same correspondence, another WBL representative suggested that the employee should be fired for cause.
[49] Although the details of the employee's resignation are unclear, his resignation was effective on July 14, 2017. January 25, 2024, Trial Transcript, p. 153 (Doc. 119); see also Defendant's Post-Trial Brief, p. 13 (Doc. 135).
[50] Plaintiffs' Exhibit 21.
[51] Defendant's Exhibit 15, p. 2.

Trust dated January 12, 2017 (the "Deed of Trust"),[52] which contains detailed legal descriptions of the real property offered as collateral.[53]

Although the Halls were late on some payments to WBL between the First Transaction and the Fourth Transaction, the late payments were typically cured.[54]   However, on or about March 3, 2017, the Halls stopped making payments to WBL.[55]   Based upon the missed payments, WBL sent written notice of default to the Halls on March 20, 2017, and ultimately sued the Halls in the Circuit Court for Accomack County, VA on July 6, 2017.[56]   In response, the Halls filed an Answer & Counterclaim, asserting claims for rescission, fraud in the inducement, and declaratory relief.  The state court litigation was pending when Mrs. Hall and Spuddog filed their Sub-chapter V cases on July 1, 2022.

In Mrs. Hall's bankruptcy case, WBL filed a secured proof of claim ("Claim 7") in the amount of $7,323,990.19.[57]   Likewise, WBL filed a secured proof of claim ("Claim 2") in the Spuddog bankruptcy case in the amount of $7,323,990.19.[58]   In response to the claims filed by WBL, the Plaintiffs initiated this Adversary Proceeding.

## Discussion

### I.   Virginia Law, Not Florida Law, is the Applicable Law

The Court must first determine whether Florida law or Virginia law is applicable. Potentially, the application of Florida law would yield better results for the Plaintiffs because

---

[52] Defendant's Exhibit 5.
[53] The common addresses listed as collateral in the Deed of Trust are 20305 Greenbush Road, Parksley, VA 23421 and 8013 Long Lane, Temperanceville, VA 23442.  Id. at p. 2.
[54] January 25, 2024, Trial Transcript, p. 43 (Doc. 119).
[55] January 24, 2024, Trial Transcript, pp. 167-68, 273 (Doc. 118).
[56] Plaintiffs' Post-Trial Brief, p. 11 (Doc. 134).
[57] Plaintiffs' Exhibit 26.
[58] Plaintiffs' Exhibit 27.

Florida's usury statute prohibits interest over 18% (if the loan exceeds $500,000 the maximum allowable rate increases to 25%). See Fla. Stat. § 687.02.

Unlike Florida law, "[t]he Virginia legislature has expressly declined to cap interest rates applicable to loans in the amount of $5,000 or more for business or investment purposes." Azamy v. Icon Fin., LLC, 2024 Va. App. LEXIS 218, at *12 (Va. Ct. App. Apr. 23, 2024) (citing Va. Code Ann. § 6.2-317(B)).

Upon review, the Court finds the Plaintiffs' argument that Florida law applies unavailing. All relevant factors weigh in favor of applying Virginia law. The relevant collateral is located in Virginia, and the loan documents include a choice of law provision that *requires* the application of Virginia law.[59] Further, even *if* the Court were to decline to apply the choice of law provision, other relevant criteria support the application of Virginia law.

Specifically, Counts I-III of the Complaint are based on allegations of fraud, i.e. – tort claims. When determining tort claims, Virginia courts typically apply the law of the state where the tortious actions occurred. See Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999). Similarly, Florida resolves conflicts of law in tort to apply the law of the state with the most significant relationship to the tortious occurrence. See State Farm Mut. Auto. Ins. Co. v. Olsen, 406 So. 2d 1109, 1110 (Fla. 1981). Under either test, Virginia law should apply.

Importantly, the *relevant* in-person discussions regarding the loans occurred in Virginia.[60] Further, much of what the Halls view as WBL's most egregious conduct occurred during in-person meetings in Virginia between the Halls, Gary Stewart, Tesh Shere, and

---

[59] Plaintiffs' Exhibits 12, 15, 21.
[60] While some telephonic conversations took place with WBL employees who were not located in Virginia, the Halls and Gary Stewart were in Virginia during these conversations.

Michael John.[61]  Finally, the Halls resided and were physically present in Virginia when they signed the loan agreements.  The *sole* connection with Florida is that the Plaintiffs filed bankruptcy in Florida after relocating there, which occurred *years* after the execution and subsequent default of the WBL Loans.   The Court finds that such a tenuous connection has no bearing on the business dealings between the parties and is insufficient to apply Florida law. See, e.g., In re Ovetsky, 100 B.R. 115, 117 (Bankr. N.D. Ga. 1989).

**II.    No Agency Relationship Between Mr. Shere and WBL**

Next, the Court must examine the Plaintiffs' position that Mr. Shere acted as an agent of WBL.  In support of their position, the Plaintiffs rely heavily on written and oral statements made by Mr. Shere.  The Virginia Supreme Court has "defined the term 'agency' as a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act."  Transparent GMU v. George Mason Univ., 298 Va. 222, 246 (Va. 2019) (quoting Acordia of Virginia Ins. Agency, Inc. v. Genito Glenn, L.P., 263 Va. 377, 384, 560 S.E.2d 246 (Va. 2002)).  "While the power of control is an important factor to consider in determining whether an agency relationship exists,'[a]gency may be inferred from the conduct of the parties and from the surrounding facts and circumstances."  Id.  "[T]he party alleging an agency relationship has the burden of proving it."  Id. (quoting Reistroffer v. Person, 247 Va. 45, 48, (Va. 1994)).

The Court finds that as an independent broker, Mr. Shere was *not* subject to the control of WBL.  Importantly, there is no evidence to indicate that Mr. Shere or his affiliated companies were ever considered employees of WBL or acting with authority to bind WBL.[62]  While the

---

[61] January 25, 2024, Trial Transcript, pp. 14-17 (Doc. 119).
[62] Id. at p. 144; Defendant's Exhibit 9, p. 7, ¶ 2.g.

Court understands and has considered that Mrs. Hall "was under the impression" that Mr. Shere worked for WBL, a WBL representative never told her that Mr. Shere was a WBL employee. Based on Mrs. Hall's testimony, she believed that Mr. Shere was employed by WBL primarily because she was not informed otherwise.[63]  While operating as an independent broker, Mr. Shere attempted to obtain financing from multiple sources.  As indicated in a March 17, 2016 email, Mr. Shere informed the Halls that he had two interested "investors," one being WBL.[64] The Court notes that Mr. Shere's e-mail correspondence, which stated that he was the Senior Vice President of Kwik Capital, should have also served as an indication that he was not employed by WBL.

As discussed above, Mrs. Hall and Mr. Stewart were financially sophisticated because of their prior work experience.  Additionally, Mr. Hall, while running the day-to-day operations, grew the family business from a few chicken houses to a multimillion-dollar operation that included farming, trucking services, grain storage, produce sales, and clamshell sales. Collectively, the Halls' and Mr. Stewart's financial and business backgrounds undermine their position that they were completely unaware of the arms-length relationship between Mr. Shere and WBL.  Based on the foregoing, the Court finds that the Plaintiffs did not meet their burden to establish any actual or apparent agency relationship between Mr. Shere and WBL.

### III.    Count I: Fraudulent Inducement

Count I of the Complaint is a claim for fraudulent inducement.  Under Virginia law, the elements of a claim for fraudulent inducement are:

    (i)      statements of fact;
    (ii)     made for the purpose of procuring the contract;
    (iii)    that the facts are false and material;

---

[63] January 24, 2024, Trial Transcript, pp. 44, 59 (Doc. 118).
[64] Defendant's Exhibit 11, p. 2.

  (iv)  that the party to whom they were made relied on them and was induced by them to enter into the contract.

Sayers v. Fuentes, 108 Va. Cir. 67, 69 (Va. Cir. Ct. 2021).

  Simply stated, fraudulent inducement involves "a misrepresentation [that] entices a party to enter into a contract that, but for the fraud, he would not have entered into." Id. The elements of fraudulent inducement must be proven through clear and convincing evidence. See Flippo v. Csc Assocs. Iii, 262 Va. 48, 66 (Va. 2001).

 A. Plaintiffs Failed to Prove Harm & Inducement

  To successfully prove fraudulent inducement, the Plaintiffs must demonstrate that but for the fraud, they would not have entered into the WBL agreement. Sayers v. Fuentes, 108 Va. Cir. 67, 69 (Va. Cir. Ct. 2021). Plaintiffs must also make a clear and convincing showing they were harmed because of their reliance on the fraudulent misrepresentation. Flippo v. Csc Assocs. Iii, 262 Va. 48, 66 (Va. 2001).

  As a starting point, the Court will consider the Hall's financial position immediately prior to entering into the loan with WBL. The evidence is clear that the Halls were in dire financial straits before they decided to accept financing from WBL. The conventional financing options the Halls historically had with various banks were now non-existent,[65] which is what led them to seek financing from MCA lenders. As unattractive as the terms offered by the MCA lenders were, the Halls desperately needed financing to fund their extensive operations. By late 2015, the Halls sought alternative financing options in hopes of keeping their businesses open. Context is very important in the Court's consideration of this issue, and the above background clearly illustrates that absent the WBL financing in May 2016, the Halls undeniably would have had to discontinue their operations. Regrettably, the Halls' grim financial issues persisted

---

[65] January 24, 2024, Trial Transcript, pp. 38-39 (Doc. 118).

throughout their lending relationship with WBL.  Despite WBL's loathsome financing terms, Mrs. Hall testified that they "would have been in a little worse shape if we hadn't gotten [the first loan]."[66]  Given that the MCA lenders were actively obtaining judgments and garnishing the Halls' bank accounts,[67] the Halls would have been in worse shape without the WBL loans. This conclusion is further supported by Mrs. Hall's testimony that they could not have funded payroll without the funds furnished by WBL in the Fourth Transaction.[68]  The Court has given considerable thought to this issue because the terms of the WBL loans are egregious.  However, based on the grim and desperate predicament the Halls were in when they sought financing from WBL, and because the financing provided the Halls temporary relief when no other options were available, the Court finds that the Plaintiffs failed to demonstrate harm through clear and convincing evidence.

Next, the Court considers whether the Plaintiffs were induced into entering the financial transactions with WBL by the allegedly fraudulent statements.  The uncontroverted evidence is that the Halls needed immediate financing from WBL, because they had exhausted all other avenues for conventional financing.  While the terms of the financing offered by WBL can be categorized as exorbitant, the financing nonetheless allowed the Halls to continue their business operations and satisfy some of the burdensome MCA loans.  The Court is sympathetic to the devastating predicament the Halls found themselves in.  The Halls were forced to choose between accepting the onerous financing terms offered by WBL or shuttering the doors of the family business.  The finite issue the Court must decide is whether the Plaintiffs carried their burden of proving fraudulent inducement with clear and convincing evidence.  Without

---

[66] Id. at p. 223.
[67] Id. at p. 222.
[68] Id. at p. 259; see also Defendant's Exhibit 15, p. 2.

question, the Plaintiffs had trepidation about entering the financing arrangement with WBL. The weight of the evidence, however, reflects that whatever misgivings the Halls had were offset by their desperation to obtain financing, and not the result of the allegedly fraudulent statements.   Accordingly, the Plaintiffs did not carry their burden to prove fraudulent inducement with clear and convincing evidence.

B. Lack of Materially False Representations

The Court will now consider the Plaintiffs' allegations that WBL made materially false representations.  Upon review, the Court finds that the evidence fails to clearly demonstrate that WBL never intended to assist the Halls with conventional financing.  The Plaintiffs' rely heavily on oral and written statements made by Mr. Shere.  However, as discussed above, the Court finds that the Plaintiffs did not establish an agency relationship between Mr. Shere and WBL.  Therefore, the Plaintiffs cannot impute misrepresentations made by Mr. Shere to WBL. Importantly, even *if* the Plaintiffs were able to impute certain statements by Mr. Shere to WBL, Mr. Shere's promises of future conventional financing were qualified with various conditions that had to be satisfied in order for the Halls to be approved for conventional financing.[69]

The Plaintiffs also point to oral statements made by Michael John, specifically that he was a "magician" and could "pull a rabbit out of a hat."[70]  These statements, however, cannot support a *material* misrepresentation because they are "puffery" or "seller's talk" and not material facts.  See, e.g. RML Corp. v. Lincoln Window Prods., 67 Va. Cir. 545, 568 (Va. Cir. Ct. 2004); see also Baker v. Brunswick Corp., No. 2:17-cv-572-FtM-99MRM, 2018 U.S. Dist. LEXIS 69453, at *19 (M.D. Fla. Apr. 25, 2018).  Additionally, even if the Court gave any

[69] Tesh Shere's e-mail to the Halls stated that the First Transaction would be a bridge loan to conventional financing once the Halls could *"get [] out of the hole, pay off [their] other lenders, clean up [their] credit situation, clean up [their] Confessions of Judgment]."*  Plaintiffs' Exhibit 6, p. 2 (emphasis added)).
[70] January 24, 2024, Trial Transcript, p. 45 (Doc. 118).

weight to these statements, it would be negated by qualifying statements made by WBL that further due diligence was required before the Halls could receive additional financing.[71]

The evidence also indicates that WBL informed the Halls that certain conditions had to be met prior to them being approved for conventional financing.[72]  This includes WBL's continued efforts to conduct due diligence and gather documents subsequent to the closure of the First Transaction.[73]  Mr. Stewart also acknowledged that WBL wanted to see if the Halls would be able to timely make the interim payments and candidly admitted that the payments were sometimes late.[74]

The Court also notes the testimony of WBL's corporate representative that WBL did not itself provide conventional financing.  The niche service offered by WBL was that its brokerage division would connect its customers with lenders who offered conventional financing.  The Court finds this testimony important because it demonstrates that WBL had legitimate avenues to assist the Halls in obtaining conventional financing.   While the Court is sympathetic to the Halls' disappointment with not being approved for conventional financing, the evidence does not clearly reflect that WBL never intended to assist them with such financing.  While the evidence is inconclusive as to why the Halls failed to obtain conventional financing, their inability to meet certain relevant risk-related criteria such as credit history or financial performance and viability weighed against them.

---

[71] Karen Hall was told by Michael John that a WBL employee would "get right to work on" conventional financing. Id.

[72] For example, the Conditional Loan Approval included this statement: "Validation of value for properties located at GROTON, 8013 LONG LN, SAXIS RD 20305 GREENBUSH RD, BLACKSTONE CHASE, RUSSELL DUMP AND LANKFORD HWY OAK HALL VA 23416 with encumbrances no greater than $0."  Plaintiffs' Exhibit 4.

[73] Mrs. Hall testified that much of the documentation provided to WBL was provided after the First Transaction closed.  Defendant's Exhibit 17, p. 61.

[74] January 25, 2024, Trial Transcript, p. 43 (Doc. 119).

Based on the lack of clear evidence on damages, inducement, and material misrepresentations, the Court finds that the Plaintiffs failed to prove fraudulent inducement.

### IV.    <u>Count II: Intentional Misrepresentation</u>

Count II of the Complaint is a claim for intentional misrepresentation, which is essentially a claim for fraud.  To prevail on Count II, the Plaintiffs must show "clear and convincing evidence of an intentional and knowing misrepresentation of a material fact, made with the intent to mislead, and relied upon by another to his or her detriment."  <u>See</u> <u>Flippo v. Csc Assocs. Iii</u>, 262 Va. 48, 66 (Va. 2001).

This standard is similar to the Court's analysis in Count I.  As discussed above, the Plaintiffs failed to prove by clear and convincing evidence that they suffered harm or that WBL made materially false representations.  Therefore, the Court will deny the claim for intentional misrepresentation.

### V.    <u>Count III: Negligent Misrepresentation</u>

Count III of the Complaint is a claim for negligent misrepresentation.  Under Virginia law, "there is no separate claim for negligent misrepresentation."  <u>Sun Hotel v. Summitbridge Credit Invs. III, LLC</u>, 86 Va. Cir. 189, 194 (Va. Cir. Ct. 2013).  The closest corollary would be a claim for constructive fraud, which requires clear and convincing evidence of: (1) a false representation of a material fact made innocently or negligently; and (2) the injured party was damaged as a result of his reliance upon the misrepresentation.  <u>See id.</u> at 193.

As discussed above, the Plaintiffs did not prove by clear and convincing evidence that they suffered harm or that WBL made materially false representations.  Therefore, the Court will deny the claim for negligent misrepresentation.

## VI.    Count IV: Recharacterization of Debt as Equity

The Plaintiffs request that the Court use its equitable powers under 11 U.S.C. § 105(a) to recharacterize the WBL debt as equity.    In determining whether a loan should be recharacterized as a capital contribution, courts consider the following factors:

1. the names given to the instruments, if any, evidencing the indebtedness;
2. the presence or absence of a fixed maturity date and schedule of payments;
3. the presence or absence of a fixed rate of interest and interest payments;
4. the source of repayments;
5. the adequacy or inadequacy of capitalization;
6. the identity of interest between the creditor and the stockholder;
7. the security, if any, for the advances;
8. the corporation's ability to obtain financing from outside lending institutions;
9. the extent to which the advances were subordinated to the claims of outside creditors;
10. the extent to which the advances were used to acquire capital assets; and
11. the presence or absence of a sinking fund to provide repayments.

Henkel v. The Brothers Mill, Ltd. (In re Eddy), 2015 Bankr. LEXIS 1113, at *19-20 (Bankr. M.D. Fla. Apr. 3, 2015) (citing Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.), 269 F.3d 726, 749-50 (6th Cir. 2001)).    The Court will analyze each factor in turn below.

1. The names given to the WBL Documents include: "Business Loan Summary," "Business Loan Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)," "Business Promissory Note and Security Agreement," and "Continuing Guaranty (Unlimited)."[75]    The Court finds that the existence of these written documents and the titles of the documents weigh against recharacterizing the WBL Transactions[76] as equity.    See AutoStyle Plastics, 269 F.3d at 750.

---

[75] Plaintiffs' Exhibits 12, 15, 16, and 21.
[76] The "WBL Transactions" are the First, Second, Third and Fourth Transactions.  The "WBL Documents" are the documents executed by the Halls in connection with the WBL Transactions.

2.  The WBL Documents provide for a fixed maturity date and schedule of payments.[77] The existence of a fixed maturity date and payment schedule weighs against recharacterization.  Id.

3.  The WBL Documents provide for a fixed rate of interest.[78]  Accordingly, this factor weighs against recharacterization.  Id. at 750-51.

4.  As to the source of repayments, "[i]f the expectation of repayment depends *solely* on the success of the borrower's business, the transaction has the appearance of a capital contribution."  Id. at 751 (emphasis added).  Although the source of repayments was not specifically defined in the WBL Documents, it is logical that the parties expected payments would come, to some extent, from the Halls' business operations.[79]  Despite this expectation, WBL also obtained a guaranty and collateral, including real estate.  Therefore, repayment was not *solely* reliant on the success of the Halls' businesses, and this factor weighs against recharacterization.  Id.

5.  The fifth factor weighs in favor of recharacterization when "a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation."  In re Cold Harbor Assocs., L.P., 204 B.R. 904, 917 (Bankr. E.D. Va. 1997).  Although Spuddog was newly formed and undercapitalized, the Halls' other businesses had been operating for many years prior to the WBL Transactions.  Additionally, the Court considers capitalization at the time of the transactions.   Autostyle Plastics, 269 F.3d at 751.  Although the

---

[77] For example, the First Transaction defines the Repayment Period as May 12, 2016, to May 12, 2017, and daily payments of $2,402.78, followed by a final payment of $2,402.32 on May 12, 2017.  Plaintiffs' Exhibit 12, p. 2.

[78]  For example, the First Transaction provides that interest shall accrue at the rate of "0.331365947945% per day until paid in full."  Plaintiffs' Exhibit 12, p. 18.

[79] For instance, WBL made it an event of default if some event adversely impacted the Borrower's ability to repay WBL.  WBL also obtained a lien on the Borrower's revenue.  Thus, WBL was partially reliant on the success of the Halls' businesses.  Plaintiffs' Exhibit 12, p. 20.

Halls were severely undercapitalized at the time of the transactions, they were not the ones making the loans to their affiliated companies.  Therefore, this factor weighs against recharacterization.  Id.


6. WBL was not a shareholder.  There was *no* identity of interest between WBL and the Halls and this factor therefore weighs against recharacterization.  Id. at 751-52.

7. "The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans."  Id. at 752.  Here, WBL had security for the funds provided to the Halls.  The parties dispute the extent of that security but not the existence of security.  Even under the Halls' theory of the case, WBL's security included real and personal property.[80]  Therefore, this factor weighs against recharacterization.  Id.

8. The Halls historically obtained loans from conventional financial institutions.  However, by the time of the WBL Transactions, the Halls were unable to secure conventional financing and could *solely* obtain loans from MCA lenders.  Given the status of outside financing, historically and at the time of the WBL Transactions, this factor weighs slightly in favor of recharacterization.  Autostyle Plastics, 269 F.3d at 752.

9. A capital contribution is implicated when the advances are subordinated to "claims of all other creditors."  Id.  WBL did not subordinate its claims to other creditors.  In fact, WBL declined to close on the First Transaction until BB&T released its lien.  Therefore, this factor weighs against recharacterization.  Id.

---

[80] Plaintiffs' Post-Trial Brief, pp. 8-9 (Doc. 134).

10. The funds from WBL were used to meet the daily operating needs of the Halls' businesses and cover farming expenses such as seed, fertilizer, chemicals, equipment repairs, fuel, and payroll.[81] The funds were not used to acquire capital assets.  Therefore, this factor weighs against recharacterization.  Id. at 752-53.

11. No sinking fund was established to repay the funds received from WBL.  However, the existence of collateral obviates the need for a sinking fund.  Id. at 753. Accordingly, the Court finds this factor's impact on the analysis to be neutral.

In total, nine factors weigh against recharacterization, one factor slightly supports recharacterization, and one factor is neutral.  Based on the overwhelming weight of the analysis, the Court declines to use its equitable power under § 105(a) to recharacterize the WBL debt as equity.

### VII.    COUNT VI: Equitable Subordination

"Equitable subordination is an extraordinary remedy that should be invoked only in extreme circumstances."  In re Downer, 2011 Bankr. LEXIS 5830, at *5 (Bankr. M.D. Fla. Aug. 1, 2011) (internal quotations marks omitted) (quoting Grede v. Bank of N.Y. Mellon, 441 B.R. 864, 886 (N.D. Ill. 2010)).  Typically, equitable subordination is limited to cases involving insider claimants that have: (1) committed fraud, an illegal act, or breached a fiduciary duty, (2) formed a new, undercapitalized company, or (3) controlled or used the debtor as an alter ego.  See id. at *5 (citing In re Granite Partners, L.P., 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997)).  None of these scenarios are present here.

Furthermore, in this proceeding, the Plaintiffs' burden of proof is higher because WBL is a non-insider.  Id. at *5-6.  In non-insider cases, the plaintiff must prove "egregious conduct

---

[81] See, e.g., Plaintiffs' Exhibit 8.

such as fraud, spoliation, or overreaching, and prove it with particularity." Id. at *6 (quoting In re Rich Capitol, LLC, 436 B.R. 224, 232 (Bankr. S.D. Fla. 2010)).  As discussed above, the Court already determined that the Plaintiffs failed to prove fraud and failed to demonstrate harm.  The Plaintiffs were in dire financial straits and facing imminent collection on approximately $500,000 in MCA loans.

In addition, although the exorbitant interest rate and onerous terms dictated by WBL are not in debate, the Halls possessed a sophisticated business background as they ran a multimillion-dollar operation for many years that included farming, trucking services, grain storage, produce sales, and clamshell sales.  Furthermore, the Halls were represented by counsel throughout the origination and funding of each of the WBL Transactions.[82]

Ultimately, the Halls were left in an untenable situation.  Despite their best efforts, they no longer had access to conventional financing, and while Mrs. Hall and Mr. Stewart understandably thought the WBL terms were usurious, the exorbitant interest rates charged were permissible under Virginia law.  See Va. Code Ann. § 6.2-308 (West 2010); see also Power Up Lending Grp., Ltd. v. Alliance Bioenergy Plus, Inc., 2019 U.S. Dist. LEXIS 33274, at *11 (E.D.N.Y. Feb. 28, 2019) ("Virginia law does not provide corporations protection against usurious transactions.").

The Halls were therefore left to "pick their poison" of either closing down the family business or agreeing to the exorbitant financing terms offered by WBL.  Without the WBL transactions, the Halls' prospects were bleak.  They needed funds immediately to make payroll, to fend off aggressive collection actions by MCA lenders, and otherwise avoid imminent cessation of their business operations.[83]  The Halls were truly desperate.  However, the Court

---

[82] January 24, 2024, Trial Transcript, pp. 213, 215 (Doc. 118).
[83] Id. at pp. 221-23.

cannot base its ruling on the disastrous circumstances that the Halls found themselves in.  To be clear, the Court does not condone the financing terms offered by WBL.  Regrettably, however, the particular facts and circumstances discussed in detail throughout this opinion do not support a finding of equitable subordination, particularly for a non-insider such as WBL.

### VIII.   COUNT VIII: Objection to Claim

Count VIII relies on arguments already addressed and rejected by the Court.  Therefore, for the reasons stated in the foregoing discussion, the Plaintiffs' Objection to Claim is overruled.

### Conclusion

The Court commends the Halls for their life service to the honorable profession of farming.  The opportunity to build a flourishing business, as the Halls did, with the work of their own hands, is what drives the American dream.

Sadly, the Halls' life circumstances were in an extremely unfortunate state of affairs when they encountered WBL, as their once thriving business was crumbling.  The bankruptcy court is here to assist honest but unfortunate debtors such as the Halls.  However, the Court is also bound to follow the rule of law based on all relevant facts and circumstances.  While the Court does not approve of the exorbitant interest rates charged by WBL, Virginia law does not contain usury prohibitions for corporate loans.  As outlined in the analysis, the law and evidence when viewed through the lens of this Proceeding ultimately do not weigh in favor of the Halls.  Therefore, the Court finds the Plaintiffs failed to meet their burden of proof concerning the Counts of the Complaint addressed herein and will enter a separate judgment in favor of WBL consistent with these Findings of Fact and Conclusions of Law.